(Slip Opinion)

# Interpretation of "Federal Means-Tested Public Benefit" in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996

This Office concluded in 1997 that the phrase "Federal means-tested public benefit," as used in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, could permissibly be read to include only benefits administered under mandatory (but not discretionary) federal spending programs. We therefore deferred to two agencies' interpretation under the *Chevron* framework. Having been asked to reconsider in view of *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), we now conclude that the best reading of "Federal means-tested public benefit" is its plain meaning and withdraw our earlier opinion.

A "Federal means-tested public benefit" is any federal public benefit for which the eligibility of an individual, household, or family eligibility unit for benefits, or the amount of such benefits, or both, are determined on the basis of the income, resources, or financial need of the individual, household, or unit—regardless of the funding sources for that federal public benefit.

December 16, 2025

MEMORANDUM OPINION FOR THE DEPUTY GENERAL COUNSEL
DEPARTMENT OF HEALTH AND HUMAN SERVICES

In 1996, Congress enacted bipartisan legislation to overhaul the national welfare system. *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Pub. L. No. 104-193, 110 Stat. 2105 (codified in relevant part as amended at 8 U.S.C. § 1601 *et seq.* & 42 U.S.C. § 601 *et seq.*). Among other things, title IV of PRWORA significantly reformed eligibility requirements for aliens seeking access to welfare benefits by "deny[ing] illegal aliens benefits for public services or welfare." *The President's Radio Address*, 1 Pub. Papers of Pres. William J. Clinton 646, 647 (May 6, 1995), https://perma.cc/9ETS-9CS6.

Just five months later, however, this Office told the Department of Health and Human Services ("HHS") and Department of Housing and Urban Development ("HUD") that it would be permissible to interpret PRWORA's phrase "Federal means-tested public benefit" as affecting *only* benefits administered under mandatory (and not discretionary) federal spending programs. *See Proposed Agency Interpretation of "Federal Means-Tested Public Benefit[s]" Under Personal Responsibility and Work Opportunity Reconciliation Act of 1996*, 21 Op. O.L.C. 21, 21 (1997) ("1997 Opinion") (alteration in original). We applied the

interpretive framework from *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and opined that the statutory text was ambiguous considering its legislative history, 21 Op. O.L.C. at 22. We therefore concluded that HHS and HUD could extend benefits to aliens under discretionary benefit programs. *See id.* at 36–37.

As a result, many federal agencies since 1997 have not restricted welfare benefits funded by discretionary spending from flowing to aliens. Today, by some estimates, 59 percent of illegal-alien-headed households receive government welfare. *See The Impact of Illegal Immigration on Social Services: Hearing Before the Subcomm. on Immigr. Integrity, Sec., & Enf't of the H. Comm. on the Judiciary*, 118th Cong. 25 (2024) (testimony of Steven A. Camarota, Dir. of Rsch., Ctr. for Immigr. Stud.).

You have asked us to reconsider our 1997 Opinion.[1] The Supreme Court recently overruled *Chevron*, *see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024), undercutting our 1997 Opinion's analytical framework and confirming that we must seek the "best" interpretation of a statute, not merely a "permissible" one, *id.* at 2266. Moreover, the 1997 Opinion's approach—divining statutory ambiguity from legislative history—did not reflect best practices of statutory interpretation. *See Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011). In view of intervening precedent and our reassessment of the statutory text, we now withdraw our 1997 Opinion and confirm that PRWORA's eligibility requirements for "Federal means-tested public benefit[s]" apply to both mandatory and discretionary spending programs.

## I.

### A.

Congress enacted title IV of PRWORA in 1996 to address abuse of the welfare system by aliens in the United States. Because the then-existing "eligibility rules for public assistance and unenforceable financial support agreements ha[d] proved wholly incapable of assuring that individual aliens not burden the public benefits system," Congress aimed to "enact new rules to assure that aliens be self-reliant." PRWORA

---

[1] *See* Memorandum for Josh Craddock, Deputy Assistant Attorney General, Office of Legal Counsel, from Emily Claire Mimnaugh, Deputy General Counsel, Department of Health and Human Services (Sept. 15, 2025) ("Mimnaugh Memo"). We understand that HUD concurs in this request.

§ 400(4)–(5), 110 Stat. at 2260 (codified at 8 U.S.C. § 1601(4)–(5)). Congress stressed that its intent was to further the "compelling governmental interest [of] remov[ing] the incentive for illegal immigration provided by the availability of public benefits." *Id.* § 400(6) (codified at 8 U.S.C. § 1601(6)). Together with the Illegal Immigration Reform and Immigration Responsibility Act, Pub. L. No. 104-208, div. C, 110 Stat. 3009-546 (1996), which it enacted one month later, Congress made a concerted effort to reform what it perceived to be a noxious relationship between immigration and taxpayer-funded public benefits.

PRWORA thus contains many provisions designed to restrict aliens' access to public benefits. It generally limits federal and state public benefits to "qualified" aliens. *See* PRWORA § 401, 110 Stat. at 2261–62 (codified at 8 U.S.C. § 1611) (federal public benefits); *id.* § 411, 110 Stat. at 2268 (codified as amended at 8 U.S.C. § 1621) (state and local public benefits); *see also id.* § 431(b), 110 Stat. at 2274 (codified as amended at 8 U.S.C. § 1641(b)) (defining "qualified alien"). Qualified aliens are then subject to additional eligibility requirements before they may receive benefits. For example, qualified aliens generally cannot obtain "any Federal means-tested public benefit" until they have been in the United States for five years with a qualified status. *Id.* § 403(a), 110 Stat. at 2265 (codified at 8 U.S.C. § 1613(a)). And PRWORA takes an expansive view of an alien's financial means by including the "income and resources" of an alien's spouse or sponsor in its calculation of the alien's total assets. *Id.* § 421(a), 110 Stat. at 2270 (codified as amended at 8 U.S.C. § 1631(a)).

The enacted version of PRWORA does not define the term "Federal means-tested public benefit," though earlier versions of the bill did. The closely related term "Federal public benefit" is broadly defined by the statute as "any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States." *Id.* § 401(c)(1)(A), 110 Stat. at 2262 (codified at 8 U.S.C. § 1611(c)(1)(A)). That term also includes "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States." *Id.* § 401(c)(1)(B) (codified at 8 U.S.C. § 1611(c)(1)(B)). An earlier version of PRWORA contained a similarly expansive definition of "Federal means-tested

public benefit." *See* H.R. 3734, 104th Cong. § 2102(c) (as received by Senate, July 18, 1996). Like the definition of "Federal public benefit," this proposed definition did not distinguish between federal benefits funded from mandatory versus discretionary spending sources. But because the Senate Parliamentarian sustained a single senator's procedural point of order during reconciliation, the enacted version of the statute did not contain a definition.

Senator J. James Exon's point of order was a jurisdictional objection commonly known as the "Byrd Rule." Congress adopted the Byrd Rule in 1985 and codified it in 1990 within the previously established budget framework of the Congressional Budget Act of 1974 ("CBA"), Pub. L. No. 93-344, titles I–IX, 88 Stat. 297, 299–332. *See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 13214, 104 Stat. 1388, 1388–621 (codifying the Byrd Rule within the CBA at 2 U.S.C. § 644); Bill Heniff Jr., Cong. Research Serv., RL30862, *The Budget Reconciliation Process: The Senate's "Byrd Rule"* at 1–2 (updated Sept. 28, 2022), https://perma.cc/U39Q-CDG6 ("CRS, *Byrd Rule*"). This procedural device allows any senator to remove provisions from reconciliation bills when the provisions do not meet the statutory requirements for such bills and are thus considered "extraneous matter." CRS, *Byrd Rule* at 3. Senator Exon's omnibus point of order raised Byrd Rule objections to several provisions in the Senate PRWORA bill, including the definition of "Federal means-tested public benefit." 142 Cong. Rec. 18,296–97 (1996). He offered no explanation on the floor at that time, but his list of proposed edits stated that the definition fell outside the jurisdiction of the Senate Committee on Finance. *Id.* at 18,297 (citing 2 U.S.C. § 644(b)(1)(C)). The Senate Parliamentarian upheld the point of order on that ground, and also because the Byrd Rule "prohibits language in a reconciliation bill or conference report if [a provision's] deficit reduction is merely incidental to the [provision's] larger policy changes." *See id.* at 20975 (citing 2 U.S.C. § 644(b)(1)(D)).

The conference report for PRWORA confirmed that the definition of federal means-tested public benefit "was deleted due to the Byrd rule." H.R. Rep. No. 104-725, at 381–82 (1996) (Conf. Rep.). The very next sentence of the report explained, however, that it was "the intent of conferees that this definition be presumed to be in place for purposes of this title." *Id.* at 382. Congress did not enact any other definitional provision in place of the deleted one. But in the next sentence of the conference report, *id.*, it added a new provision under the heading "Application of

[the] Term Federal Means-tested Public Benefit," *see* PRWORA § 403(c), 110 Stat. at 2266. That provision—section 403(c)—included a list of benefits exempted from the eligibility requirements otherwise applicable to federal means-tested public benefits. *Id.* Among these exclusions were two discretionary spending programs—"Head Start" and title I of the Workforce Innovation and Opportunity Act (known as "Job Training"). *Id.* § 403(c)(2)(J)–(K).

### B.

Immediately after PRWORA took effect, HHS and HUD took the position that the statutory phrase "Federal means-tested public benefit" was "best construed to apply only to mandatory (and not discretionary) spending programs." 1997 Opinion, 21 Op. O.L.C. at 21. Our Office balked at calling that the *best* interpretation. But, "guided by the Supreme Court's landmark opinion" in *Chevron*, *id.* at 23, as well as the statute's legislative history, we blessed the agencies' interpretation as "a *permissible* and legally binding construction," *id.* at 21 (emphasis added).

Because PRWORA was "enacted as a budget reconciliation bill," our 1997 Opinion reasoned that it must be "construed against the backdrop" of the CBA. *Id.* Of course, the CBA itself does not mention federal means-tested public benefits. That act simply created an expedited process for legislation that implements congressional budget resolutions, *see* 2 U.S.C. § 641, and created a procedural mechanism to strike bill provisions that do not significantly affect the budget, *id.* § 644. So rather than looking to the text of the CBA, our 1997 Opinion reviewed how Senator Exon deployed his Byrd Rule objection during PRWORA's reconciliation process and the resulting deletion of the definition for "Federal means-tested public benefit" from the bill. *See* 21 Op. O.L.C. at 21–22, 24–27. The 1997 Opinion noted that the Senate Parliamentarian sustained Senator Exon's objection because, "to the extent the definition encompassed discretionary programs, its impact on the budget was 'merely incidental.'" *Id.* at 26 (quoting 2 U.S.C. § 641(b)(1)(D)). "In light of this history," our 1997 Opinion concluded that "the meaning of the phrase 'federal means-tested public benefit' [was], at the very least, ambiguous." *Id.* at 22.

Having discovered ambiguity, the 1997 Opinion moved to the next step of *Chevron* and found that HHS and HUD's decision to include only

mandatory assistance programs in the definition was "a reasonable construction of the statute." *Id.* After inferring that "Congress intended for the agencies to resolve the interpretive ambiguity," *id.* at 32; *see also id.* at 34, and that the agencies' definition was "manifestly 'permissible'" in view of PRWORA's "statutory purposes," the 1997 Opinion concluded that *Chevron* required deference to the agencies' interpretation and that their interpretation was a "legally binding construction," *see id.* at 36–37.

Relying on that opinion, HHS issued a notice that it would interpret "Federal means-tested public benefit" under PRWORA to "include only benefits provided by means-tested, *mandatory* spending programs." Interpretation of "Federal Means-Tested Public Benefit", 62 Fed. Reg. 45,256, 45,257 (Aug. 26, 1997) (emphasis added). Under that narrowed interpretation, "only two HHS programs were affected by the PRWORA's new requirements." Mimnaugh Memo at 3; *see also* 62 Fed. Reg. at 45,257 ("[T]he HHS programs that constitute 'Federal means-tested public benefits' under PRWORA are Medicaid and [Temporary Assistance for Needy Families].").

## II.

Mindful of the "careful and respectful consideration" owed to prior views of our Office, we have nevertheless determined it is appropriate to reconsider and "depart from our precedent[]" here. *See Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*, 42 Op. O.L.C. 158, 159 (2018) ("*Wire Act*"). Our 1997 Opinion hinged on an analytical framework that the Supreme Court has now rejected. *See Loper Bright*, 144 S. Ct. at 2248. Like the judiciary, we seek the "best meaning" of the statutory text. *Compare id.* at 2266, *with Permitting Part-Time Employees to Work Regularly Scheduled Weeks of 33 to 39 Hours*, 39 Op. O.L.C. 99, 111 (2015) ("[O]ur role is to identify the best reading of the Act using standard tools of statutory construction.").[2]

---

[2] To be clear, we do not cast doubt on our prior opinions that merely cited or applied *Chevron*. An interpretation reached under an application of *Chevron* may still be the best reading of a statute, and prior opinions of this Office remain "controlling, authoritative and binding within the Executive Branch," *Campaign for Accountability v. U.S. Dep't of Just.*, 155 F.4th 724, 731 (D.C. Cir. 2025) (internal quotation marks and citation omitted), unless overruled or withdrawn, *see, e.g., Whether the Creation of Natcast*

By its own terms, the 1997 Opinion did not advance the best reading of PRWORA, but merely what it considered a "permissible" one urged by HHS and HUD. 21 Op. O.L.C. at 21. Our 1997 Opinion also relied almost exclusively on legislative history to reach the conclusion that PRWORA was ambiguous—an approach inconsistent with both Supreme Court instruction and our own precedent. *See, e.g.*, *Milner*, 562 U.S. at 574; *Legal Authority of the Department of the Treasury to Issue Regulations Indexing Capital Gains for Inflation*, 16 Op. O.L.C. 136, 150–51 (1992). Refocusing on PRWORA's text, however, reveals that the reading adopted in our 1997 Opinion was not even a permissible one. We now retract that opinion and offer the best reading of the phrase "Federal means-tested public benefit."

## A.

The key question is whether PRWORA's limitation on aliens' receipt of certain benefits applies to *all* federal welfare programs, regardless of their funding source, or just to welfare programs funded by mandatory (but not discretionary) spending. "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Expenditure of Appropriated Funds for Informational Video News Releases*, 28 Op. O.L.C. 109, 119 (2004) (quoting *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004)). "[U]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (citation omitted); *see also Fed. Deposit Ins. Co. v. Meyer*, 510 U.S. 471, 476 (1994). Here, PRWORA supplies half the answer by defining the baseline phrase "Federal public benefit" in extremely capacious terms. PRWORA § 411(c)(1), 110 Stat. at 2262 (codified at 8 U.S.C. § 1611(c)(1)). As our 1997 Opinion acknowledged, PRWORA defines that phrase "broadly, and in a manner that appears to draw no distinction between mandatory and discretionary programs." 21 Op. O.L.C. at 28.

Though PRWORA does not separately define "Federal *means-tested* public benefit," *see* PRWORA § 403, 110 Stat. at 2265–67 (emphasis added), the term's ordinary meaning is easily deciphered. It is a

---

*Violates the Government Corporation Control Act*, 49 Op. O.L.C. __, at *21 (Sept. 2, 2025).

"fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (cleaned up). The statute tells us what federal public benefits are, and the "phrase 'means-tested' . . . is defined in the dictionary." 1997 Opinion, 21 Op. O.L.C. at 28. Dictionaries contemporaneous with PRWORA define "means test" as "any examination of the financial state of a person as a condition precedent to receiving social insurance, public assistance benefits, or other payments from public funds." *Webster's Third New International Dictionary* 1399 (1986); *see also The American Heritage Dictionary of the English Language* 1116 (3d ed. 1996) (defining "means test" as "[a]n investigation into the financial well-being of a person to determine the person's eligibility for financial assistance"); *Random House Dictionary of the English Language* 1192 (2d ed. 1987) (defining "means test" as "an investigation into the financial position of a person applying for aid from public funds").

A federal means-tested public benefit, then, is best understood as any federal public benefit for which the eligibility of an individual, household, or family eligibility unit for benefits, or the amount of such benefits, or both, are determined on the basis of the income, resources, or financial need of the individual, household, or unit—regardless of the funding sources, whether mandatory or discretionary, for that federal public benefit.[3]

Nothing in PRWORA indicates Congress deviated from that ordinary meaning. Nor is there any textual basis for distinguishing between

---

[3] Our 1997 Opinion suggested that PRWORA was unclear about the precise contours of the statute's means test. *See* 21 Op. O.L.C. at 28 n.14 (referencing the specific factors reviewed in other statutory means tests). We did not consider then, however, that title IV of PRWORA specifies how to "determin[e] the eligibility and the amount of benefits" available to an alien "for *any* Federal means-tested public benefits program" by calculating the alien's "income and resources." PRWORA § 421(a), 110 Stat. at 2270 (codified at 8 U.S.C. § 1631(a)) (emphasis added). This indicates that PRWORA's means test considers both income and resources as factors—two variables that are expressly considered by other federal statutes containing means tests. *See* 1997 Opinion, 21 Op. O.L.C. at 28 n.14. If the use of those two variables in the other federal statutes is sufficient to create clarity in those contexts, then it is also sufficient in PRWORA. In any event, any imprecision in the statutory text about PRWORA's means test would create uncertainty only about the information relevant to determining an alien's means. It would not create ambiguity about whether discretionary benefits are federal means-tested public benefits.

means-tested benefits funded through mandatory spending programs as opposed to discretionary ones. Congress could have easily added language to clarify that PRWORA affected only federal means-tested public benefits funded from mandatory spending programs if that was the case, yet it did not do so. "[T]he plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." *Lynch v. Alworth-Stephens Co.*, 267 U.S. 364, 370 (1925) (citation omitted).

Indeed, the lack of distinction in PRWORA between mandatory and discretionary funding sources harmonizes with the definitions of similar phrases used elsewhere in the U.S. Code. For example, the similar phrase "means-tested Federal benefit program" is used to refer to benefits funded from mandatory and discretionary funding sources alike. *See, e.g.*, 20 U.S.C. § 1067q(c)(5) (defining the term to include any "program of the Federal Government . . . in which eligibility for the programs' benefits or the amount of such benefits are determined on the basis of income or resources of the individual or family seeking the benefit"); *id.* § 1087ss(b)(4)(H) (including both mandatory and discretionary funded programs under the term's umbrella). We are not aware of any other instance in which the application of a similar statutory phrase has hinged on whether the funding source is discretionary or mandatory.

The 1997 Opinion conceded that the statutory definition of "Federal public benefit" and the plain meaning of "means-tested" arguably "combine to produce a phrase that is sufficiently plain." 21 Op O.L.C. at 28. But it nevertheless "f[ou]nd this argument inconclusive" for two reasons. *Id. First*, the 1997 Opinion observed that "combining plain terms" does not "necessarily result[] in an equally plain phrase." *Id.* That is true enough as a general matter. But the only reason the 1997 Opinion identified for applying that principle here was "[a]n unrelated provision" in a different title of the statute. *Id.* at 28 n.15 (citing PRWORA § 911(b), 110 Stat. at 2353 (codified at 42 U.S.C. § 608a(b))). That provision defined the term "'means-tested welfare or public assistance program for which Federal funds are appropriated' to include" the food stamp program, federal housing assistance, and "'any State program funded under part . . . of the Social Security Act.'" *Id.* The 1997 Opinion supposed that "the fact that Congress concluded that it was necessary to provide a definition of some sort" meant that "Congress did not believe that the

meaning of the defined phrase was plain." *Id.* By extension, the argument went, Congress would have likely found the term "Federal means-tested public benefit" unclear too. *Id.*

That conclusion does not follow. Congress's decision to define a very different and more cumbrous phrase in a distinct statutory title does not shed light on whether Congress thought "Federal means-tested public benefit" was ambiguous. For example, Congress may have provided the definition in section 911(b) to clarify that the section covered *state* programs receiving certain federal funding—an inclusion not facially obvious from the phrase itself. The term "Federal means-tested public benefit," by contrast, is closely related to the defined term "Federal public benefit." It would lack facial clarity only if the reader otherwise presupposed a latent ambiguity—namely, that Congress meant to distinguish between mandatory and discretionary funding sources when determining eligibility for means-tested benefits.

*Second*, and more importantly, the 1997 Opinion asserted that the plain meaning of "Federal means-tested public benefit" was not "*sufficiently* plain to . . . effectively overrule[] the prior Byrd rule deletions." 21 Op. O.L.C. at 28 (emphasis added). Indeed, it claimed that "the critical question is not whether the phrase 'federal means-tested public benefit' is plain," but instead "whether the phrase reveals that Congress intended to incorporate the definition that the Senate had deleted." *Id.* at 29.

This framing flipped the order of operations for statutory interpretation, which must "start, as always, with the text." *Bufkin v. Collins*, 145 S. Ct. 728, 737 (2025); *see also Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 109 (2007) (Scalia, J., dissenting) (calling the alternative "a most suspicious order of proceeding"). Our 1997 Opinion nodded to this axiom, *see* 21 Op. O.L.C. at 23, but failed to heed it. That was wrong, because an interpreter should "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994). It is improper to draw an inference from legislative history and only then ask if the text is sufficiently clear to rebut that inference. After all, "[l]egislative history, for those who take it into account, is meant to clear up ambiguity, not create it." *Milner*, 562 U.S. at 574. Yet that is precisely what our 1997 Opinion did when it reasoned backward from legislative history to cast doubt on plain meaning,

thereby subordinating the enacted statutory text to the procedural minutiae of legislative history.

## B.

Statutory context and structure reinforce our conclusion that the plain meaning of "Federal means-tested public benefit" in PRWORA does not distinguish between discretionary and mandatory spending. Title IV included findings about the "increasing rates" at which aliens were "applying for and receiving public benefits." PRWORA § 400(3), 110 Stat. at 2260 (codified at 8 U.S.C. § 1601(3)). Congress expressly designed title IV of PRWORA to ensure "that aliens be self-reliant" and "not burden the public benefits system." *Id.* § 400(4)–(5) (codified at 8 U.S.C. § 1601(4)–(5)). Reading "Federal means-tested public benefit" as including both mandatory and discretionary spending programs would be consistent with title IV's animating policy that "aliens within the Nation's borders not depend on public resources to meet their needs." *Id.* § 400(2)(A) (codified at 8 U.S.C. § 1601(2)(A)).

Of course, "no legislation pursues its purposes at all costs," and it would be "simplistic[] to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam) (emphasis in original). But there are no "limitations expressed in statutory terms" here, *Stanley v. City of Sanford*, 145 S. Ct. 2058, 2067 (2025) (citation omitted), that would indicate Congress designed the statutory provision governing "Federal means-tested public benefit[s]" to circumscribe PRWORA's pursuit of its broader aims. Atextually narrowing the meaning of that term to apply only to a very few spending programs would be inconsistent with the statute's enacted findings and purposes.

Section 403 of PRWORA further supports our interpretation. That section—under the heading "Application of Term Federal Means-tested Public Benefit"—includes a list of benefits that are excepted from the usual five-year waiting period for qualified aliens to access federal means-tested public benefits. PRWORA § 403(c)(2), 110 Stat. at 2266 (codified as amended at 8 U.S.C. § 1613(c)(2)). Two of these enumerated exceptions are discretionary grant programs—Head Start and Job Training. *Id.* § 403(c)(2)(J)–(K) (codified as amended at 8 U.S.C. § 1613(c)(2)(J)–(K)). Interpreting the phrase "Federal means-tested public benefit" to exclude any benefits from discretionary funding

sources would render these exemptions superfluous. That result would be in tension with the "cardinal principle" that an interpreter "must give effect, if possible, to every clause and word of a statute." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citation omitted). It would also violate the rule that when "Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent" expressed in the statute. *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (citation omitted). By reading "Federal means-tested public benefit" to cover only mandatory spending programs, the 1997 Opinion transformed the exceptions in section 403(c)(2) into the rule.

Our 1997 Opinion identified several counterarguments to the inference from section 403 that "Federal means-tested public benefit" generally includes all such benefits irrespective of funding source, but we do not find them persuasive.

*First*, the 1997 Opinion thought it "likely that many, if not most, members [of Congress] did not know precisely which programs fell into which category" of spending. 21 Op. O.L.C. at 30. That rationale flips our default presumptions that Congress means what it says and that it legislates against the backdrop of existing law. *See Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496 (2022); *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019). It also attributes to Congress a startling ignorance of funding sources for federal benefits while simultaneously inferring that Congress impliedly exempted a sweeping category of federal benefits due to their funding source.

*Second*, the 1997 Opinion suggested that Congress's inclusion of two discretionary funding programs in section 403(c)(2) of PRWORA was a drafting error because there is no "mechanism for re-drafting remaining legislative provisions to conform them" following a Byrd Rule deletion. 21 Op. O.L.C. at 29–30. Despite the 1997 Opinion's attention to legislative process, it failed to consider that the conferees could have chosen not to adopt the House bill's two exceptions for discretionary spending programs. *See* H.R. Rep. No. 104-725, at 382; *see also* Elizabeth Rybicki, Cong. Research Serv., 98-696, *Resolving Legislative Differences in Congress: Conference Committees and Amendments Between the Houses* at 14–15 (updated May 22, 2019), https://perma.cc/79EU-MD6A. Insofar as PRWORA's legislative process was relevant to its meaning—as our 1997 Opinion claimed—it is noteworthy that the conferees added the Head Start and Job Training exceptions from the House

bill immediately after acknowledging the Byrd Rule deletion of the "Federal means-tested public benefit" definition. *See* H.R. Rep. No. 104-725, at 381–82. The addition of those programs would make no sense if Congress believed it had just excluded benefits funded from discretionary spending programs from the meaning of "Federal means-tested public benefit." To the contrary, the report's sequence underscores that Congress believed that the procedural deletion of the definitional provision did not change the statutory meaning.

*Third*, in a similar vein, the 1997 Opinion pointed to what it described as "other drafting flaws" in PRWORA to conclude that the inclusion of the two discretionary spending programs in section 403(c)(2) was an oversight. 21 Op. O.L.C. at 29. Specifically, section 403 also excepts certain "community level" services "necessary for the protection of life or safety" that are not conditioned on a "recipient's income or resources." PRWORA § 403(c)(2)(G), 110 Stat. at 2266 (codified at 8 U.S.C. § 1613(c)(2)(G)). That exception, the 1997 Opinion suggested, would also be surplusage because it is not means-tested. *See* 21 Op. O.L.C. at 29.

Neither view of the statute perfectly explains why Congress included section 403(c)(2)(G). But our 1997 Opinion ignored a meaningful difference between subsection (c)(2)(G) and subsections (c)(2)(J) and (K)—namely, that subsection (c)(2)(G) is repeated verbatim throughout title IV of PRWORA. This repetition evidently reflected Congress's overriding concern that critical services "necessary for the protection of life or safety" be clearly excepted from PRWORA's otherwise broad restrictions on benefits for aliens. *See, e.g.*, PRWORA § 401(b)(1)(D), 110 Stat. at 2261 (codified at 8 U.S.C. § 1611(b)(1)(D)); *id.* § 403(c)(2)(G), 110 Stat. at 2266 (codified at 8 U.S.C. § 1613(c)(2)(G)); *id.* § 411(b)(4), 110 Stat. at 2268 (codified at 8 U.S.C. § 1621(b)(4)); *id.* § 422(b)(7)(C), 110 Stat. at 2271 (codified at 8 U.S.C. § 1632(b)(7)); *id.* § 423(d)(7), 110 Stat. at 2274 (codified at 8 U.S.C. § 1183a note). Other exceptions that appear repeatedly throughout title IV likewise protect emergency services.[4]

---

[4] These include an exception for medical care "necessary for the treatment of an emergency medical condition." *See, e.g.*, *id.* § 401(b)(1)(A), 110 Stat. at 2261 (codified at 8 U.S.C. § 1611(b)(1)(A)); *id.* § 403(c)(2)(A), 110 Stat. at 2266 (codified at 8 U.S.C. § 1613(c)(2)(A)); *id.* § 411(b)(1), 110 Stat. at 2268 (codified at 8 U.S.C. § 1621(b)(1)); *id.* § 422(b)(1), 110 Stat. at 2271 (codified at 8 U.S.C. § 1632(b)(1)); *id.* § 423(d)(1), 110 Stat. at 2273 (codified at 8 U.S.C. § 1183a note). PRWORA also repeatedly excepts

While the inclusion of section 403(c)(2)(G) was not strictly necessary, we understand that "Congress may on occasion repeat language in order to emphasize it." *United States v. Johnson*, 114 F.4th 148, 159 (3d Cir. 2024) (quoting *Marx v. Gen. Revenue Corp.*, 668 F.3d 1174, 1183 (10th Cir. 2011)); *see also King v. Burwell*, 576 U.S. 473, 502 (2015) (Scalia, J., dissenting) ("Lawmakers sometimes repeat themselves . . . out of a desire to add emphasis."). The exceptions in sections 403(c)(2)(J) and (K) for Head Start and Job Training, by contrast, are included in just one parallel provision where the inclusion was sensible. *See* PRWORA § 423(d)(9), (11), 110 Stat. at 2274 (codified as amended at 8 U.S.C. § 1183a note).[5]

We are "loathe to conclude that Congress made" a drafting error "if there is another explanation of the relevant language." *Revocation of Prior Monument Designations*, 49 Op. O.L.C. __, at *48 (May 27, 2025) ("*Monument Designations*") (citing *Corley v. United States*, 556 U.S. 303, 315 (2009)). Statutory language should only be considered a drafting error when it is "apparent from the face of the law" or "decrees an absurd result—a consequence 'so monstrous, that all mankind would, without hesitation, unite in rejecting the application.'" *King*, 576 U.S. at 514 (Scalia, J., dissenting) (quoting *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 203 (1819) (Marshall, C.J.)). That stringent test is not satisfied here. There are plausible explanations for why the inference from section 403 is the correct one and not an unintended relic of reconciliation. And even if there had been some drafting error, as the 1997 Opinion asserted, "[i]t is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think is the preferred

---

short-term "emergency disaster relief." *See, e.g.*, *id.* § 401(b)(1)(B), 110 Stat. at 2261 (codified at 8 U.S.C. § 1611(b)(1)(B)); *id.* § 403(c)(2)(B), 110 Stat. at 2266 (codified at 8 U.S.C. § 1613(c)(2)(B)); *id.* § 411(b)(2), 110 Stat. at 2268 (codified at 8 U.S.C. § 1621(b)(2)); *id.* § 422(b)(2), 110 Stat. at 2271 (codified at 8 U.S.C. § 1632(b)(2)); *id.* § 423(d)(2), 110 Stat. at 2273 (codified at 8 U.S.C. § 1183a note).

[5] Section 423 of PRWORA imposes requirements for affidavits of sponsors seeking an alien's admission under the Immigration and Nationality Act and makes sponsors liable to reimburse the government for "any public benefit under any means-tested public benefits program" that a sponsored alien receives. 110 Stat. at 2271–72 (codified at 8 U.S.C. § 1183a). Section 423 lists excepted benefits from that rule that precisely parallel the exceptions given in section 403(c). That parity makes sense: an alien's sponsor cannot be liable to reimburse the government for a means-tested benefit that the alien received if it was among the limited, excepted benefits under section 403(c) that a sponsored alien may be eligible to obtain.

result." *Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004) (alteration and citation omitted).

## C.

Legislative history cannot undermine a meaning evident from the plain text and structure of a statute. *See Castro-Huerta*, 142 S. Ct. at 2496–97. Although PRWORA itself is clear and unambiguous, we address its legislative history because that history drove the analysis in our 1997 Opinion. A careful and holistic examination of PRWORA's legislative history shows that the history "is ambiguous at best." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019).

## 1.

The load-bearing facts of our 1997 Opinion were Senator Exon's parliamentary point of order against the proposed definition of "Federal means-tested public benefit" and the definition's subsequent deletion from the bill. We emphasized that, "[a]lthough Senator Exon's specific objection to the definition, as itemized in his list, was jurisdictional only," the Senate Parliamentarian upheld the objection on both the jurisdictional ground and the ground that, "to the extent the definition encompassed discretionary programs, its impact on the budget was 'merely incidental.'" 21 Op. O.L.C. at 26 & n.11. From these facts, we discovered statutory ambiguity.

The 1997 Opinion justified its pivot from PRWORA's text to this legislative history by characterizing our approach as an application of the doctrine that "a provision in one act of Congress should be read in conjunction with other relevant statutory provisions." *Id.* at 23. But rather than compare the text of another statutory provision to PRWORA's phrase "Federal means-tested public benefit," we focused on how the Byrd Rule—as incorporated into the CBA—worked in practice during the legislative process that enacted PRWORA.

That novel, process-based approach to statutory interpretation disguised the 1997 Opinion's reliance on legislative history and misapplied the *in pari materia* canon. Nothing in the CBA's statutory text informs the meaning of PRWORA's phrase "Federal means-tested public benefit." *See* 2 U.S.C. § 644(a), (b)(1). The CBA simply states a *procedural* rule meant to safeguard the Senate's deliberative process in

reconciliation. It is not—as we suggested in our 1997 Opinion—an interpretive rule for construing other laws akin to the Dictionary Act, 1 U.S.C. § 1. *See* 21 Op. O.L.C. at 24. Furthermore, none of the cases we cited in the 1997 Opinion to bolster the validity of our approach used Senate procedural rules to interpret statutory text, as we did. *See id.* at 23–24.[6] To the contrary, at least one circuit court had already specifically rejected that approach to statutory interpretation. *See Elizabeth Blackwell Health Ctr. for Women v. Knoll*, 61 F.3d 170, 180 (3d Cir. 1995), *cert. denied*, 516 U.S. 1093 (1996).[7]

The 1997 Opinion similarly purported to apply the canon that "Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." 21 Op. O.L.C. at 29 (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987)). Our application of that venerable canon missed the mark, however. During PRWORA's reconciliation process, the Senate Parliamentarian struck a

---

[6] *See, e.g.*, *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 738–39 (1989) (Scalia, J., concurring in part and concurring in the judgment) (applying the general-specific canon to interpret a general statute by reference to a more specific statute on that topic); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569–70 (1995) (considering multiple provisions of the same statute using the same term); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 711–12 (1996) (applying *in pari materia* canon to interpret one statutory provision in light of its neighboring provision); *Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 357 (1963) (applying the presumption against implied repeal of a statute in interpreting another statute); *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 666 (1979) (applying a general definition from the Dictionary Act in absence of "context indicat[ing] to the contrary").

[7] In *Elizabeth Blackwell*, abortionists argued that state-law eligibility requirements for Medicaid coverage of abortion were at odds with Supreme Court precedent requiring states to fund all abortions for which federal funds were available. 61 F.3d at 179. They observed that federal law originally included eligibility requirements like those in the state law, but that in later reenactments of the federal statute, Congress had rejected versions with those requirements on procedural grounds. *Id.* From this legislative history, the abortionists inferred that Congress intended to prohibit such requirements. *Id.* The Third Circuit was unconvinced, ruling that Congress's rejection of a provision "on procedural grounds provides *no* basis for any inference about Congress's views about the substantive provisions of the legislation." *Id.* at 180 (emphasis added).

The 1997 Opinion attempted to distinguish *Elizabeth Blackwell* by suggesting in a footnote that the "procedural objection made . . . did not in any way suggest that Congress intended the specific interpretation offered in that case." 21 Op. O.L.C. at 27 n.12. That conclusion is doubtful. But more importantly, the Third Circuit's decision did not, contrary to our 1997 Opinion's framing, turn on how strongly the procedural basis for a legislative deletion "suggest[ed]" a particular interpretation of the enacted statute; instead, it categorically rejected the validity of drawing interpretive inferences from procedural deletions altogether. *See* 61 F.3d at 180.

proposed definition of the phrase "Federal means-tested public benefit" based on a procedural objection from one senator. Congress did not "discard[]" the definition "*in favor of other language*." *Cardoza-Fonseca*, 480 U.S. at 442–43 (emphasis added). Rather, Congress simply did not include any definitional provision.

There is no basis to infer that, because one senator objected to a definitional provision in a point of order, Congress intended to incorporate a different and opposite definition. Such an inference is further undermined by the language Congress did enact—"Federal means-tested public benefit." That is a broad phrase that facially encompasses *all* benefit programs, whatever their funding source. In short, the canon we used in our 1997 Opinion should carry *less* weight—not "particular force," 21 Op. O.L.C. at 29—when the deletion of a definitional provision was due to a single senator's procedural objection and the Senate Parliamentarian's agreement. "[F]loor statements by individual legislators rank among the least illuminating forms of legislative history." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017). That maxim holds truer still for explanations offered by an unelected Senate Parliamentarian—whose decisions "reflect a judgment call," Rebecca M. Kysar, *Interpreting by the Rules*, 99 Tex. L. Rev. 1115, 1144 (2021), and are not binding on the Senate, *see* Valerie Heitshusen, Cong. Research Serv., RS20544, *The Office of the Parliamentarian in the House and Senate* at 1–2 (updated Nov. 28, 2018), https://perma.cc/7Z79-NSS5.

The 1997 Opinion thus piloted a novel approach to statutory interpretation that required consideration of legislative history for an entire subset of federal laws enacted through reconciliation. *See* 21 Op. O.L.C. at 25 ("The meaning of a particular provision of reconciliation legislation . . . must be construed in light of congressional actions taken pursuant to the CBA.").[8] Nothing in "the purpose and language" of the CBA, *id.* at 27, requires that approach. Little wonder, then, that although this Office has often been called upon to interpret legislation enacted through reconciliation, we have never again interpreted such a law based on the congressional procedures employed during its enactment.

---

[8] This conclusion has potentially significant ramifications for other federal statutes. From the time Congress adopted the Byrd Rule in 1985 through September 2022, the Senate considered 23 reconciliation measures. *See* CRS, *Byrd Rule* at 6. Senators raised specific Byrd Rule points of order in 19 of those bills, with the substantial majority (73 of 83) sustained in whole or in part. *Id.* at 8–10.

The methodology in our 1997 Opinion is also difficult to square with principles of textualism and the Constitution's vesting of legislative power in Congress. "[I]f the conventions of legislative history or the legislative process reveal that Congress used language in something other than its natural sense, a textualist [interpreter] should not necessarily defer to that meaning." Amy Coney Barrett, *Congressional Insiders and Outsiders*, 84 U. Chi. L. Rev. 2193, 2194 (2017). What matters "is how the ordinary English speaker—one unacquainted with the peculiarities of the legislative process—would understand the words of a statute." *Id.* The Constitution sets the lawmaking process, *see* U.S. Const. art. I, § 7, and the public is entitled to rely on the words produced by that process. Congressional customs and practices of lawmaking do not give license to imbue enacted texts with hidden meanings.

## 2.

The 1997 Opinion also cited floor colloquies from a few senators—including Senator Exon—for their understanding that, "[u]nder the Byrd rule, the budget reconciliation process cannot be used to change discretionary spending programs." 21 Op. O.L.C. at 31 n.20 (quoting 142 Cong. Rec. at 20,975 (statement of Sen. Ted Kennedy)). Upon review, we disagree that these exchanges constituted "strong evidence" of the meaning of "Federal means-tested public benefit." *Id.* at 26. It bears repeating that such "floor statements by individual legislators rank among the least illuminating forms of legislative history." *NLRB*, 580 U.S. at 307.

Even if our analysis could properly turn on this legislative history, other aspects of the legislative record contradict it. As our 1997 Opinion acknowledged, the conference report noted the deletion of the definitional provision but explained in the very next sentence that it "is the intent of conferees that this definition be presumed to be in place for purposes of this title." H.R. Rep. No. 104-725, at 382. One of those conferees was Senator Exon. *Id.* at 504. The 1997 Opinion rejected this legislative statement of intent, reiterating the principle that Congress does not silently enact language it previously "discarded in favor of other language," 21 Op. O.L.C. at 30 (quoting *Cardoza-Fonseca*, 480 U.S. at 442–43)—a rule that, as we have explained, does not apply here.

If PRWORA's legislative record clearly establishes anything, it is that divining statutory meaning from legislative history is fraught with

danger. *See Monument Designations* at *48.[9] We accordingly part ways with the 1997 Opinion and decline to hang the meaning of "Federal means-tested public benefit" on that parlous hook.

## III.

"Our Office embraces a 'long tradition of general adherence to Executive Branch legal precedent.'" *Reconsidering the Application of the Hyde Amendment to the Provision of Transportation for Women Seeking Abortions*, 49 Op. O.L.C. __, at *17 (July 11, 2025) (quoting *Wire Act*, 42 Op. O.L.C. at 177). Yet "as with any system of precedent," reconsidering our prior opinions is appropriate where intervening precedent undermines our conclusion or when we have identified other "errors in the supporting legal reasoning." *Id.* (quoting *Wire Act*, 42 Op. O.L.C. at 177–78); *see also Statutory Rollback of Salary to Permit Appointment of Member of Congress to Executive Office*, 33 Op. O.L.C. 201, 201–02 (2009). Here, the Supreme Court's decision in *Loper Bright* and the errors in statutory interpretation that we have identified are sufficient to warrant withdrawing our 1997 Opinion.

Whatever reliance might have developed on our prior interpretation cannot overcome adherence to the plain statutory text. *See Wire Act*, 42 Op. O.L.C. at 180; *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1930 (2020) (Thomas, J., concurring in part and dissenting in part). While some aliens may have come to rely on means-tested public benefits funded through discretionary spending programs, the existence of such reliance on federal welfare contradicts the textually expressed congressional policy that aliens must not rely on taxpayer support or burden the public benefits system. *See* PRWORA § 400(4)–(5), 110 Stat. at 2260 (codified at 8 U.S.C. § 1601(4)–(5)); *see also id.* § 400(1) ("Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes."). Congress gave clear notice about the "restrictions on the use of those funds" when it enacted PRWORA. *Cf. Nat'l Fed'n of Indep. Bus. v.*

---

[9] One Supreme Court Justice has observed that, "[i]n a world without initial determinations of ambiguity" where an interpreter must "decide on the best reading of the statute"—that is, in a post-*Chevron* world—legislative history (to the extent it is considered at all) is "largely limited to helping answer the question of whether the literal reading of the statute produces an absurdity." Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2150 (2016) (book review).

*Sebelius*, 567 U.S. 519, 580 (2012). It is Congress, not this Office, that weighed the relevant interests and then made the policy decision about eligibility. Our interpretation today "impose[s] no new, affirmative obligations" on recipients of public benefits. *See Illinois v. Sullivan*, 919 F.2d 428, 434 (7th Cir. 1990). It merely applies to them the text of the statute Congress enacted.

American taxpayers have interests, too, in ensuring that their tax contributions do not encourage illegal entry into the United States. *See* PRWORA § 400(6), 110 Stat. at 2260 (codified at 8 U.S.C. § 1601(6)). Americans are entitled to rely on duly enacted legislation crafted by their elected representatives and designed to protect the public fisc from abuse. While reliance interests may be relevant "in evaluating past expenditures" and may preclude attempts to divest aliens of benefits received under our prior interpretation, *see Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 670 (1985), there can be no prospective reliance on a continued misinterpretation of federal law.

For these reasons, we conclude that the best reading of "Federal means-tested public benefit" in PRWORA includes benefits under both mandatory and discretionary spending programs, and we withdraw our contrary 1997 Opinion.

T. ELLIOT GAISER
*Assistant Attorney General*
*Office of Legal Counsel*
